Slip Op. 18-123

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SIMPSON STRONG-TIE COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> MID CONTINENT STEEL & WIRE, INC., <br><br> Defendant-Intervenor. | Before: Gary S. Katzmann, Judge <br> Court No. 17-00057 |

## OPINION

[Commerce's Final Results are remanded and plaintiff's motion for judgment on the agency record is granted in part.]

Dated: September 21, 2018

George R. Tuttle, III, and Vickie Wu, The Law Offices of George R. Tuttle, of Larkspur, CA, argued for plaintiff.

Stephen C. Tosini, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With him on the brief were Chad A. Readler, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, and Sosun Bae, Trial Attorney. Of counsel on the brief was Jessica DiPietro, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Adam H. Gordon, The Bristol Group PLLC, of Washington, DC, argued for defendant-intervenor. With him on the brief was Ping Gong.

Katzmann, Judge: The court today reviews another installment in the continuing mystery series, "Is It Classified As A Nail?" See OMG, Inc., v. United States, 42 CIT __, Slip Op. 18-63

(May 29, 2018). Plaintiff Simpson Strong-Tie Company ("Simpson") challenges the Department of Commerce's ("Commerce") determination that zinc and nylon anchors imported by Simpson fall within the scope of the Antidumping Duty Orders on Certain Steel Nails from the People's Republic of China. <u>Antidumping and Countervailing Duty Order on Certain Steel Nails from the People's Republic of China: Final Scope Ruling on Simpson Strong-Tie Company's (Zinc and Nylon Nailon) Anchors</u>, 73 Fed. Reg. 44,961 (Dep't Commerce Mar. 20, 2017), P.R. 36 ("<u>Final Scope Ruling</u>"); <u>Antidumping Duty Order: Certain Steel Nails from the People's Republic of China</u>, 73 Fed. Reg. 44,961 (Dep't Commerce Aug. 1, 2008) and <u>Certain Steel Nails from the People's Republic of China</u>, 76 Fed. Reg. 30,101 (Dep't Commerce May 24, 2011) (Final Results of Changed Circumstances Review) (collectively "the <u>Orders</u>"). Simpson argues that its anchors are not steel nails and, therefore, do not fall within the scope of the <u>Orders</u> and that Commerce's scope determination is unsupported by substantial evidence on the record and is otherwise not in accordance with law. Compl., Apr. 12, 2017, ECF No. 10; Pl.'s Mot. For J. on the Agency R. and Br. in Supp., Aug. 22, 2017, ECF No. 24 ("Pl.'s Br."); Pl.'s Reply, Jan. 30, 2018, ECF No. 30. The court concludes that Commerce's determination was not in accordance with law.

## BACKGROUND

**A.     Legal and Regulatory Framework of Scope Reviews Generally.**

Dumping occurs when a foreign company sells a product in the United States for less than fair value – that is, for a lower price than in its home market. <u>Sioux Honey Ass'n v. Hartford Fire Ins. Co.</u>, 672 F.3d 1041, 1046 (Fed. Cir. 2012). Similarly, a foreign country may provide a countervailable subsidy to a product and thus artificially lower its price. <u>U.S. Steel Grp. v. United States</u>, 96 F.3d 1352, 1355 n.1 (Fed. Cir. 1996). To empower Commerce to offset economic distortions caused by dumping and countervailable subsidies, Congress enacted the Tariff Act of

1930.¹  Sioux Honey Ass'n, 672 F.3d at 1046–47.  Under the Tariff Act's framework, Commerce may -- either upon petition by a domestic producer or of its own initiative -- begin an investigation into potential dumping or subsidies and, if appropriate, issue orders imposing duties on the subject merchandise.  Id.

In order to provide producers and importers with notice as to whether their products fall within the scope of an antidumping or countervailing duty order, Congress has authorized Commerce to issue scope rulings clarifying "whether a particular type of merchandise is within the class or kind of merchandise described in an existing . . . order."  19 U.S.C. § 1516a(a)(2)(B)(vi).  As "no specific statutory provision govern[s] the interpretation of the scope of antidumping or countervailing orders," Commerce and the courts developed a three-step analysis.  Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States, 776 F.3d 1351, 1354 (Fed. Cir. 2015); Polites v. United States, 35 CIT __, __, 755 F. Supp. 2d 1352, 1354 (2011); 19 C.F.R. § 351.225(k).

Because "[t]he language of the order determines the scope of an antidumping duty order[,]" any scope ruling begins with an examination of the language of the order at issue.  Tak Fat Trading Co. v. United States, 396 F.3d 1378, 1382 (Fed. Cir. 2005) (citing Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1097 (Fed. Cir. 2002)).  If the terms of the order are unambiguous, then those terms govern.  Id. at 1382–83.

However, if Commerce determines that the terms of the order are either ambiguous or reasonably subject to interpretation, then Commerce "will take into account . . . the descriptions of the merchandise contained in the petition, the initial investigation, and [prior] determinations

---

¹ Further citations to the Tariff Act of 1930 are to the relevant portions of Title 19 of the U.S. Code, 2012 edition.

[of Commerce] (including prior scope determinations) and the [International Trade] Commission." 19 C.F.R. § 351.225(k)(1) ("(k)(1) sources"); Polites, 755 F. Supp. 2d at 1355; Meridian Prod., 851 F.3d 1375, 1382 (Fed. Cir. 2017). To be dispositive, the (k)(1) sources "must be 'controlling' of the scope inquiry in the sense that they definitively answer the scope question." Polites, 755 F. Supp. 2d at 1355 (quoting Sango Int'l v. United States, 484 F.3d 1371, 1379 (Fed. Cir. 2007)). If Commerce "can determine, based solely upon the application and the descriptions of the merchandise referred to in paragraph (k)(1) of . . . section [351.225], whether a product is included within the scope of an order . . . [Commerce] will issue a final ruling[.]" 19 C.F.R. § 351.225(d).

If section 351.225(k)(1) analysis is not dispositive, Commerce will initiate a scope inquiry under § 351.225(e), and apply the five criteria from Diversified Prods. Corp v. United States, 6 CIT 155, 162, 572 F. Supp. 883, 889 (1983) as codified in 19 C.F.R. § 351.225(k)(2).[2]

**B.   The Petition and Nail Orders.**

On May 29, 2007, Mid Continent Steel & Wire ("Mid Continent") and other producers of steel nails petitioned Commerce to impose antidumping duties on certain steel nails from the United Arab Emirates and the People's Republic of China. Letter from Grunfeld Desiderio Lebowitz Silverman Klestadt, LLP to Sec'y of Commerce Pertaining to Fastenal Scope Comments, P.R. 17 (Nov. 15, 2016) at Ex. 11, Petition for the Imposition of Antidumping Duties against Certain Steel Nails from the People's Republic of China and United Arab Emirates (May 29, 2007) ("Petition"). Commerce later determined that dumping was occurring, but first advised Customs and Border Patrol ("CBP") in Commerce Message 8213213 -- issued on July 31, 2008,

---

[2] These criteria are: (1) the physical characteristics of the product, (2) the expectations of the ultimate purchasers, (3) the ultimate use of the product, (4) the channels of trade in which the product is sold, and (5) the manner in which the product is advertised and displayed. 19 C.F.R. § 351.225(k)(2); see Diversified Prods., 572 F. Supp. at 889.

a day prior to the issuance of the Orders -- that articles classified under HTSUS 7907.00.6000 ("Other articles of zinc: other") were excluded from the scope of the Orders and advised CBP to liquidate entries on such products without the assessment of antidumping duties. Letter from Law Offices of George R. Tuttle to Sec'y of Commerce, P.R. 3–4 (July 21, 2016) ("Scope Ruling Request") at Attach. 3. Thereafter, on August 1, 2008, Commerce issued its antidumping duty Orders covering certain steel nails from China. The scope of the Orders reads in full:

> The merchandise covered by this proceeding includes certain steel nails having a shaft length up to 12 inches. Certain steel nails include, but are not limited to, nails made of round wire and nails that are cut. Certain steel nails may be of one piece construction or constructed of two or more pieces. Certain steel nails may be produced from any type of steel, and have a variety of finishes, heads, shanks, point types, shaft lengths and shaft diameters. Finishes include, but are not limited to, coating in vinyl, zinc (galvanized, whether by electroplating or hot-dipping one or more times), phosphate cement, and paint. Head styles include, but are not limited to, flat, projection, cupped, oval, brad, headless, double, countersunk, and sinker. Shank styles include, but are not limited to, smooth, barbed, screw threaded, ring shank and fluted shank styles. Screw-threaded nails subject to this proceeding are driven using direct force and not by turning the fastener using a tool that engages with the head. Point styles include, but are not limited to, diamond, blunt, needle, chisel and no point. Finished nails may be sold in bulk, or they may be collated into strips or coils using materials such as plastic, paper, or wire. Certain steel nails subject to this proceeding are currently classified under the Harmonized Tariff Schedule of the United States ("HTSUS") subheadings 7317.00.55, 7313.00.65 and 7317.00.75.
>
> Excluded from the scope of this proceeding are roofing nails of all lengths and diameter, whether collated or in bulk, and whether or not galvanized. Steel roofing nails are specifically enumerated and identified in ASTM Standard F 1667 (2005 revision) as Type 1, Style 20 nails. Also excluded from the scope are the following steel nails: 1) Non-collated (i.e., hand driven or bulk), two-piece steel nails having plastic or steel washers (caps) already assembled to the nail, having a bright or galvanized finish, a ring, fluted or spiral shank, an actual length of 0.500" to 8", inclusive; and an actual shank diameter of 0.1015" to 0.166", inclusive; and an actual washer or cap diameter of 0.900" to 1.10", inclusive; 2) Non-collated (i.e., hand-driven or bulk), steel nails having a bright or galvanized finish, a smooth, barbed or ringed shank, an actual length of 0.500" to 4", inclusive; an actual shank diameter of 0.1015" to 0.166", inclusive; and an actual head diameter of 0.3375" to 0.500", inclusive; 3) Wire collated steel nails, in coils, having a galvanized finish, a smooth, barbed or ringed shank, an actual length of 0.500" to 1.75", inclusive; an actual shank diameter of 0.116" to 0.166", inclusive; and an actual head diameter

of 0.3375" to 0.500", inclusive; and 4) Non-collated (i.e., hand-driven or bulk), steel nails having a convex head (commonly known as an umbrella head), a smooth or spiral shank, a galvanized finish, an actual length of 1.75" to 3", inclusive; an actual shank diameter of 0.131" to 0.152", inclusive; and an actual head diameter of 0.450" to 0.813", inclusive.

Also excluded from the scope of this order are corrugated nails. A corrugated nail is made of a small strip of corrugated steel with sharp points on one side. Also excluded from the scope of this order are fasteners suitable for use in powder-actuated hand tools, not threaded and threaded, which are currently classified under HTSUS 7317.00.20 and 7313.00.30.

Also excluded from the scope of this order are thumb tacks, which are currently classified under HTSUS 7317.00.10.00.

Also excluded from the scope of this order are certain brads and finish nails that are equal to or less than 0.0720 inches in shank diameter, round or rectangular in cross section, between 0.375 inches and 2.5 inches in length, and that are collated with adhesive or polyester film tape backed with a head seal adhesive.

Also excluded from the scope of this order are fasteners having a case hardness greater than or equal to 50 HRC, a carbon content greater than or equal to 0.5 percent, a round head, a secondary reduced-diameter raised head section, a centered shank, and a smooth symmetrical point, suitable for use in gas-actuated hand tools.

While the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of this order is dispositive.

Orders (emphasis added).

On July 13, 2010, CBP reclassified zinc anchors previously classified under HTSUS 7317 as properly falling under HTSUS 7907.00.6000 ("Other articles of zinc: other") because "the anchor generally predominates by weight." ACE Request 23031: Nail-In Anchors with Steel Nails, A-570-909, P.R. 36 (Mar. 27, 2012) at Attach. 2.

C.  **Factual and Procedural History of this Case.**

On July 21, 2016, Simpson, an importer of zinc and nylon anchors, filed a request with Commerce for a scope ruling that its zinc and nylon anchors should be excluded from the scope of

the Orders.  Scope Ruling Request.  In its Scope Ruling Request, Simpson described its zinc and nylon anchors as follows:

> The Zinc Nailon™ Anchors consist of two components: (1) a zinc alloy body; and (2) a carbon and stainless steel (Type 304) drive pin.  Simpson's zinc anchors are assembled at the time of importation, meaning that the steel pin has been inserted into the body of the zinc alloy anchor.  Simpson's zinc Nailon™ anchors are classified under subheading 7907.00.6000 (footnote omitted) of the Harmonized Tariff Schedules of the United States (HTSUS).
>
> The Nylon Nailon™ Anchors also consist of two components.  Rather than a zinc alloy body, however, they have a nylon shell or body, and likewise have a carbon and stainless steel (type 304) pin.  The Nylon Nailon™ pin drive anchors are classified pursuant to GRI 3(b) and the "composite goods" rule under HTSUS heading 3926 as: Other articles of plastics and articles of other materials of headings 3901 to 3914, specifically 3926.90.9980 "other."

Id. at 4.

Following Simpson's Scope Ruling Request, Mid Continent submitted comments arguing that Simpson's zinc and nylon anchors were within the scope of the Orders.  Letter from the Bristol Group PLLC to Sec'y Commerce, P.R. 18 (Nov. 15, 2016).  Simpson filed timely rebuttal comments.  Letter from Law Offices of George R. Tuttle to Sec'y Commerce, P.R. 22 (Nov. 23, 2016) ("Simpson Rebuttal Comments").  Midwest Fastener, Corp. and Fastenal Company Purchasing also submitted comments in support of Simpson's Scope Ruling Request.  Letter from Clark Hill PLC to Sec'y Commerce, P.R. 21 (Nov. 23, 2016); Letter from Gunfeld Desiderio Lebowitz Silverman Klestadt, LLP to Sec'y Commerce, P.R. 26 (Nov. 25, 2016).

On March 20, 2017, Commerce issued its Final Scope Ruling, in which it determined that, although the language of the Orders did not expressly mention anchors, the unambiguous language of the Orders reasonably included anchors and the (k)(1) sources supported its conclusion; therefore, Simpson's zinc and nylon anchors were within the scope of the Orders.  Final Scope Ruling at 12.  Specifically, Commerce determined that the description of Simpson's anchors, the

ITC Report description of the domestic like product under the heading "The Product" -- which described "a masonry anchor that comprises a zinc anchor and a steel wire nail" -- and its prior scope determinations dispositively placed Simpson's anchors within the scope of the Orders. Id. at 11.

Simpson filed a complaint with this court contesting the Final Scope Ruling and on August 22, 2017, Simpson submitted its Motion for Judgment on the Agency Record and Brief in Support. Compl.; Pl.'s Br. Defendant the United States ("The Government") and defendant-intervenor Mid Continent submitted their briefs in opposition on November 30, 2017. Def.-Inter.'s Br., ECF No. 28; Def's. Br., ECF No. 29. Simpson replied on January 20, 2017. Pl.'s Reply., ECF No. 30. Oral argument was held before this court on September 6, 2018. ECF No. 45.

## JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(vi). The standard of review in this action is set forth in 19 U.S.C. § 1516a(b)(l)(B)(i): "[t]he court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."

## DISCUSSION

The Government argues that: (1) Commerce's determination that Simpson's zinc and nylon anchors fit within the plain language of the Orders is in accordance with law; (2) there is substantial evidence that the (k)(1) sources dispositively place Simpson's products within the scope of the Orders; (3) a formal scope inquiry was unnecessary and thus Commerce did not need to consider the (k)(2) sources; and (4) Commerce may instruct CBP to retroactively suspend liquidation on Simpson's shipments entered prior to the date of Commerce's ruling.

"[T]he question of whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that we review de novo." Meridian, 851 F.3d at 1382. The court concludes that the products at issue are not nails within the plain meaning of the word "nail" and, therefore, are outside the scope of the Orders.

As the Federal Circuit has held, the terms of an order govern its scope. Duferco, 296 F.3d at 1097; see Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1072 (Fed. Cir. 2001); Wheatland Tube Co. v. United States, 161 F.3d 1365, 1370 (Fed. Cir. 1998). "Although the scope of a final order may be clarified, it can not be changed in a way contrary to its terms." Duferco, 296 F.3d at 1097 (quoting Smith Corona Corp. v. United States, 915 F.2d 683, 686 (Fed. Cir. 1990)). For that reason, "if [the scope of an order] is not ambiguous, the plain meaning of the language governs." ArcelorMittal Stainless Belg. N.V. v. United States, 694 F.3d 82, 87 (Fed. Cir. 2012).

"In determining the common meaning of a term, courts may and do consult dictionaries, scientific authorities, and other reliable sources of information including testimony of record." NEC Corp. v. Dep't of Commerce, 23 CIT 727, 731, 74 F. Supp. 2d 1302, 1307 (1999) (quoting Holford USA Ltd. v. United States, 19 CIT 1486, 1493–94, 912 F. Supp. 555, 561 (1995)). Furthermore, antidumping duty orders "should not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant industry." Fedmet Res. Corp. v. United States, 755 F.3d 912, 921 (Fed. Cir. 2014) (quoting ArcelorMittal, 694 F.3d at 88). Accordingly, "[b]ecause the primary purpose of an antidumping order is to place foreign exporters on notice of what merchandise is subject to duties, the terms of an order should be consistent, to the extent possible, with trade usage." ArcelorMittal, 694 F.3d at 88.

A nail, as defined by OXFORD'S ENGLISH DICTIONARY (3rd ed. 2003) is "a small metal spike with a sharpened end and a blunt head, which may be driven in to a surface with a hammer or other tool in order to fasten things together." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000) defines a nail as "[a] slim, pointed piece of metal hammered into material as a fastener." Similarly, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (UNABRIDGED) ("WEBSTER'S") (1993) defines a nail as "a slender and usually pointed and headed fastener designed for impact insertion." These definitions present a "single clearly defined or stated meaning": a slim, usually pointed object used as a fastener designed for impact insertion. Unambiguous, WEBSTER'S (1986), quoted in Meridian, 851 F.3d at 1381 n.7. Therefore, "nail" is an unambiguous term. See OMG, Slip Op. 18-63 at 9–10 (finding the meaning of the term "nail" used in scope order covering certain steel nails from Vietnam was unambiguous).

The merchandise at issue here does not fit into the above definitions. Simpson described its zinc anchor as: "(1) a zinc alloy body; and a (2) carbon and stainless steel (Type 304) drive pin." Scope Ruling Request at 4. Similarly, Simpson described its nylon anchor as: "(1) a nylon shell or body, and likewise have (2) a carbon and stainless steel (type 304) pin." Id. Commerce made its determination based upon the steel pin, arguing "an essential portion of the two-piece anchor is, in fact, made of steel, namely the steel drive nail." Final Scope Ruling at 13. However, as Commerce acknowledged in its Final Scope Ruling, Simpson's anchor nails are not reasonably separable; Simpson's anchors are unitary articles of commerce. Id. at 15; Def.'s Br. at 8, 14. As such, the entire product, not just a component part, must be defined as a nail to fall within the scope of the Orders. See OMG, Slip Op. 18-63 at 10.

The entire product is not a nail "constructed of two or more pieces." The definitions of a nail cited above define a nail as a fastener inserted by impact into the materials to be fastened. The merchandise at issue is not inserted by impact into the materials to be fastened in the same manner as a nail. Rather, Simpson's anchors "secure themselves to the wall using a mechanical wedging effect created by the expansion of the anchor against the side of a predrilled hole as a result of driving the pin in to the anchor." Scope Ruling Request at 3. Simpson describes the process as follows:

1. A hole is drilled in the base material using a carbide drill bit in the same diameter as the nominal diameter of the anchor to be installed.
2. The hole is drilled to the specified embedment depth.
3. The fixture (or item to be attached to the wall) is positioned and the Nailon™ anchor is inserted through the fixture and into the hole.
4. The Nailon™ anchor is tapped with a hammer until flush with the fixture and then the pin is driven until flush.

Scope Ruling Request at 4. Therefore, unlike two-piece nails, Simpson's anchors are not inserted by impact into the materials to be fastened and do not "grip by friction" in the same manner as a nail. Id.

Trade usage also does not support Commerce's determination. The examples of trade usage in the record demonstrate that the nail industry categorizes anchors with steel pins as anchors, not two-piece nails. Simpson Rebuttal Comments at Ex. 1 ("Metal hit anchors . . . consist of a cylindrical zinc alloy body and zinc plated steel pin expander"); Ex. 3 (describing in the Petition the merchandise intended to be covered by the scope order and excluding anchors from the list of steel wire nails); Ex. 4 (example of a "Two Piece Impact Nail" which did not include an anchor body); Ex. 5 (General Services Administration "commercial item description" of nail

anchors as including an anchor body with a steel nail).[3] For example, when the word "nail" is used, it is done so to either explicitly or implicitly modify the noun "anchor" as in "Flat Head Nail Anchors," "Mushroom Head Nail Anchors," and "Hammer Nail Drive Concrete Anchors." Id. at Exs. 5, 12. These examples evidence that industry usage comports with the plain meaning of the word "nail" because of its recognized functionality in the overall product – an anchor. According to industry usage, the pin is a nail but the unitary article of commerce is an anchor.

The court's prior decision in OMG supports this conclusion.[4] In that case, this court addressed whether the OMG merchandise -- a zinc anchor body with a steel pin -- fell within the meaning of the term "nail" as utilized in antidumping and countervailing duty orders covering "certain steel nails . . . of two or more pieces" from Vietnam. OMG, Slip Op. 18-63 at 10–11; Certain Steel Nails from the Socialist Republic of Vietnam: Countervailing Duty Order, 80 Fed. Reg. 41,006 (Dep't Commerce July 14, 2015) and Certain Steel Nails from the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam: Antidumping Duty Orders, 80 Fed. Reg. 39,994 (Dep't Commerce July 13, 2015) (collectively the "Vietnam Orders").[5] The court determined that the OMG zinc anchor was unambiguously

---

[3] The General Services Administration is a federal agency that provides centralized procurement for the federal government and its commercial item description is authorized for use by all federal agencies. Simpson Rebuttal Comments at Ex. 5; see GENERAL SERVICES ADMINISTRATION, https://www.gsa.gov/about-us/background-and-history (last visited Sept. 12, 2018).

[4] At oral argument, the Government contended that the details contained in the ITC Report for the investigation at issue here distinguished this case from OMG. See Certain Steel Nails from China, Investigation No. 731-TA-1114 (Final), USITC Publication 4022 (July 2008). This argument is unpersuasive. The plain scope language unambiguously excludes the anchors, and so a (k)(1) analysis -- in which the ITC Report would be relevant -- is unnecessary.

[5] The Vietnam Orders do, however, differ from the Orders at issue here in some of the exclusions:

> (1) Certain steel nails packaged in combination with one or more non-subject articles, if the total number of nails . . . is less than 25; (2) Certain steel nails with a nominal shaft length of one inch or less that are (a) a component of an

excluded from the scope of the Vietnam Orders because: (1) the term "nail" was unambiguous and distinct from the term "anchor"; (2) trade usage regarding delivered products guides interpretation of the proper meaning of the terms of a scope order; (3) the OMG merchandise, as a unitary article of commerce, was an anchor; and (4) the record demonstrated that the nail industry categorized the OMG merchandise as an anchor, not a nail. Id.

Similarly, here, the Simpson merchandise consists of an anchor body attached to a steel pin. Scope Ruling Request at 4. Although the Simpson merchandise also includes a nylon anchor, the distinction from a zinc anchor is immaterial because neither product is reasonably separable. Final Scope Ruling at 15. Indeed, it is for precisely that reason that Commerce determined that Simpson's anchors should be treated as unitary articles of commerce. Id. ("This is not a situation where the subject merchandise may be readily segregated from other articles with which it is packaged and separately valued for duty assessment purposes."). In contrast to nails of any sort, which are objects inserted directly into the material to be fastened without need for a predrilled hole, Simpson's anchors instead "secure themselves into the wall using a mechanical wedging effect created by the expansion of the anchor against the side of a predrilled hole as a result of

---

unassembled article, (b) the total number of nails is sixty (60) or less, and (c) the imported assembled article falls into one of the following eight groupings: 1) builders' joinery and carpentry of wood that are classifiable as windows, French-windows, and their frames; 2) builders' joinery and carpentry of wood that are classifiable as doors and their frames and thresholds; 3) swivel seats with variable height adjustment; 4) seats that are convertible into beds . . . 5) seats of cane, osier, bamboo or similar materials ; 6) other seats with wooden frames . . . 7) furniture of wood . . . or 8) furniture of materials other than wood, metal, or plastics. The aforementioned imported unassembled articles are currently classified under the following HTSUS subheadings: 4418.10, 4418.20, 9401.30, 9401.40, 9401.51, 9401.59, 9401.61, 9401.69, 9403.30, 9403.40, 9403.50, 9403.60, 9403.81 or 9403.89.

Vietnam Orders.

driving the pin in to the anchor." Scope Ruling Request at 3. In addition, as the record demonstrates, both products are categorized as anchors, and not as two-piece nails, by the nail industry. Simpson Rebuttal Comments at Exs. 1–5, 8, 12. Therefore, just like the OMG merchandise, Simpson's products are properly considered anchors and not two-piece nails. See OMG, Slip Op. 18-63 at 11.[6]

The Government asserts that "the (k)(1) sources are determinative as to whether the zinc and nylon anchors fall within the scope of the order" and, therefore, Commerce did not need to consider industry usage. Def.'s Br. at 16. However, neither Commerce in its Final Scope Ruling nor the Government in its brief furnished support for this proposition. Instead, the Government asserts that because Simpson's product "is a steel nail attached to a zinc or nylon body" and that "a product need not be explicitly listed in the scope to be included in the order," Commerce's determination was supported by substantial evidence. Id. at 17 (emphasis in original). This is a circular argument. Asserting something does not make it so, but that is precisely what Commerce did here. See Duferco, 296 F.3d at 1096 ("Commerce cannot find authority in an order based on the theory that the order does not deny authority."); Bell Supply Co., LLC v. United States, 42 CIT __, __, 179 F. Supp. 3d 1082, 1097 (2016) ("Supporting the inclusion of merchandise based on

---

[6] Meridian Products v. United States, 890 F.3d 1272 (2018), does not affect this conclusion. In that case, the Federal Circuit determined that the court had not afforded sufficient deference to Commerce's interpretation of the scope language because "Commerce's original scope ruling [wa]s reasonable and supported by substantial evidence" in that case. Id. at 1281 (citing Nippon Steel Corp. v. United States, 458 F.3d 1345, 1359 (Fed. Cir. 2006) (holding that deference is due "[s]o long as there is adequate basis in support of the [agency's] choice of evidentiary weight")). In this case, however, Commerce's determination that anchors fit within the definition of nails, viewed within the context of the relevant industry, is not reasonable or adequately supported for the reasons already discussed. Thus, Commerce's interpretation of the scope language here is not entitled to deference.

the lack of any exclusionary language is tantamount to shifting the burden to exclude certain merchandise on the party arguing for its exclusion, which . . . is incompatible with Duferco.").

Accordingly, Simpson's anchors, taken as a unitary article of commerce, are not nails within the word's plain meaning and thus do not fall within the unambiguous scope of the Orders.

## CONCLUSION

The court remands to Commerce for further consideration consistent with this opinion. Commerce shall issue appropriate instruction to U.S. Customs and Border Protection regarding the retroactive suspension of liquidation. Commerce shall file with this court and provide to the parties a revised scope determination within 90 days of the date of this order; thereafter, the parties shall have 30 days to submit briefs addressing the revised final determination to the court and the parties shall have 15 days thereafter to file reply briefs with the court.

**SO ORDERED**.

                                                    /s/   Gary S. Katzmann
                                                  Gary S. Katzmann, Judge

Dated: September 21, 2018
       New York, New York